# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRA SCHUMAN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> VISA U.S.A., INC., INCOMM FINANCIAL SERVICES, INC., and PATHWARD, N.A., <br><br> Defendants. | Civil Action No.: 1:24-cv-00666-GWH <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Ira Schuman ("Plaintiff" or "Schuman"), by his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.  This action is brought against Defendants Visa U.S.A. Inc. ("Visa"), InComm Financial Services, Inc. ("InComm"), and Pathward, N.A. ("Pathward") (collectively, "Defendants").

## NATURE OF ACTION

1.      This case arises from Defendants' deceptive marketing and sale of their Visa® Vanilla gift cards ("Visa Vanilla cards") to consumers nationwide and in New York State.  This is a consumer class action on behalf of consumers who purchased unsecure and valueless Visa Vanilla cards nationwide in New York State.

2.      Visa Vanilla cards are prepaid debit cards that are sold in retail stores throughout the United States.  Visa Vanilla cards can be used to pay for transactions both online and anywhere where Visa debit and credit cards are accepted.  When a consumer purchases a Visa Vanilla card,

he or she loads a desired monetary amount at the time the card is purchased, which becomes immediately accessible to anyone in possession of the card's account numbers. Visa Vanilla cards are commonly sold at supermarkets, gas stations, convenience stores and pharmacies such as CVS or Walgreens.

3.       Every year, consumers purchase gift cards from retailers and load money onto them, typically between $5 and $500. The cards are the size and shape of typical debit and credit cards. The packaging in which Visa Vanilla cards are sold prominently display the name "VISA" in large, bold letters. These cards are also marketed as "Visa Vanilla cards," "Vanilla Gift Cards" or "Vanilla Visa® Gift Card." Visa Vanilla cards are nonreloadable debit cards issued by FDIC Member Banks, pursuant to a license from Visa, and are frequently given as gifts by the purchasers.[1]

4.       Visa Vanilla cards can be used without access to a traditional bank account to pay for transactions without cash, pay bills, and make online or in-person purchases. As with traditional bank deposit accounts accessible through bank debt cards, consumers rightfully expect the money they put on prepaid cards to be available to spend when they or the gift recipient uses their cards.

5.       Throughout the Class Period, defined below, Defendants manufactured, marketed, sold, licensed, and/or distributed Visa Vanilla cards that Defendants knew, or should have known, were subject to an ongoing scam in which the funds on the gift cards are fraudulently redeemed or "drained" by third parties accessing the cards' account numbers.

---

[1] The cards are valid only in the United States.

6. The defective design of the packaging in which Defendants' cards are sold enabled the theft of Plaintiff's money. Specifically, the packaging is vulnerable to tampering that can go unnoticed by the reasonable consumer.

7. When a consumer purchases a Visa Vanilla card, he or she selects a card at a retailer, then presents it to a cashier who loads the consumer's desired amount of funds onto the card. The consumer pays the retailer that amount plus a $5.95 purchase charge. Thieves, however, can monitor the balances of the Visa Vanilla cards they previously accessed on Vanillagiftcard.com. When funds are loaded onto Visa Vanilla cards, thieves make unauthorized transactions with the cards until the funds are depleted before the rightful cardholder has had a chance to use them.

8. Due to the widespread news coverage of card draining, Defendants are aware of the problem of unauthorized transactions and have failed to make necessary improvements to the security features of Visa Vanilla cards to prevent the known and widespread fraudulent conduct.[2] Defendants have enabled the fraudulent conduct by failing to disclose to consumers that Visa Vanilla cards are vulnerable to tampering and theft, refusing to refund consumers that complained when they realized their Visa Vanilla cards had no value, and failing to implement and maintain reasonable security procedures and practices appropriate to protect consumers' funds.

9. As a result, Defendants have caused Plaintiff and other similarly situated consumers to purchase a product that is not secure and does not perform as represented. Plaintiff and other

---

[2] *See, e.g.*, https://abc7.com/visa-gift-card-scam-vanilla-fraud-money-scams/12494591/; https://www.nbclosangeles.com/investigations/why-gift-card-has-zero-balance-scam-holidays/3060087/; https://www.freep.com/story/money/personal-finance/susan-tompor/2022/12/21/gift-card-scams-money-back-balance/69691838007/; https://www.usatoday.com/story/money/2023/12/12/gift-card-scams-warning-2023/71891789007/.

similarly situated consumers have been harmed in the amount they paid for the gift cards and the amounts loaded on to the cards, plus interest.

10.     Plaintiff seeks relief in this action individually and on behalf of all persons in ~~the United States~~ State of New York who purchased a Visa Vanilla card on or after January 30, 2021. Plaintiff seeks to certify ~~a nationwide class for violations of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq*. ("EFTA") and a subclass~~class of consumers who purchased Visa Vanilla cards in New York for violations of New York General Business Law § 349.

## PARTIES

11.     Plaintiff Ira Schuman is, and at all times relevant to this action has been, a resident of Westchester County in the State of New York.  Schuman purchased four Visa Vanilla cards in 2022 and four cards in 2023 during the holidays at CVS as gifts for his employees.  When he purchased the cards, he loaded $500 on to each of them and then gave one to each of his employees as holiday gifts.  Of the four cards Plaintiff purchased in 2023, three were drained of funds through unauthorized transactions.

12.     Defendant Visa, a subsidiary of Visa, Inc., is a Delaware corporation with its principal executive offices in San Francisco, California, and with a place of business at 277 Park Avenue, New York, New York 10172.  Visa is engaged in the business of licensing Visa Vanilla cards in New York State and throughout the United States.  Visa provides payment processing for Visa-branded card transactions.

13.     Defendant InComm is a South Dakota corporation with its principal place of business at 2523 Williams Road, Columbus, Georgia 31909.  It is registered to do business in New York State.  InComm is engaged in the business of manufacturing, marketing and selling Visa Vanilla cards throughout the United States.  InComm is a major administrator, distributor, and

servicer of prepaid nonreloadable debit cards, including Visa Vanilla cards.  InComm is licensed as a Money Transmitter by the New York State Department of Financial Services, NMLS ID# 912772.

14.     Defendant Pathward is a Delaware corporation with its corporate headquarters at 5501 South Broadband Lane, Sioux Falls, South Dakota 57108.  Pathward is a federally chartered savings bank engaged in the business of manufacturing, marketing and selling Visa Vanilla cards throughout the United States, including New York State, and issued at least one or more of the Visa Vanilla cards purchased by Plaintiff.  Pathward is a subsidiary of Pathward Financial, Inc.[3] Pathward is a major issuer of prepaid, nonreloadable debit cards.  Defendant Pathward acts as the custodian of the Vanilla cardholder's funds, which are placed in an account at that bank and drawn down as the card is used.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from at least one defendant.  Additionally, this Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.  This Court has supplemental jurisdiction over the state law claims raised herein pursuant to 28 U.S.C § 1367 because those claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

---

[3] *See* Pathward Financial, Inc.'s Form 10-K filed with the U.S. Securities and Exchange Commission at Exhibit 21.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because this is the District in which a substantial part of the events giving rise to the claims asserted occurred, the Plaintiff resides in this District, the injuries to Plaintiff occurred here, and the cause of action arose here.

## FACTUAL ALLEGATIONS

## I.     BACKGROUND ON VISA VANILLA GIFT CARDS

17.     Throughout the Class period, Defendants have manufactured, marketed, sold, licensed, and/or distributed Visa Vanilla cards nationwide in a uniform and similar fashion. Visa Vanilla cards are sold to consumers for personal, family, or household purposes at retail stores like CVS, Walgreens, and Walmart.

18.     Visa Vanilla cards prominently feature Visa's name and its trademark logo on both the packaging in which they are sold and the cards themselves. Visa's Form 10-K filed with the United States Securities and Exchange Commission states that "Visa's growth has been driven by the strength of our core products — credit, debit and prepaid. . . . Prepaid: Prepaid cards and digital credentials draw from a designated balance funded by individuals, businesses or governments. Prepaid cards address many use cases and needs, including general purpose reloadable, payroll, government and corporate disbursements, healthcare, gift and travel. Visa-branded prepaid cards also play an important part in financial inclusion, bringing payment solutions to those with limited or no access to traditional banking products."[4]  It also states, "Service revenues consist mainly of revenues earned for services provided in support of client usage of Visa payment services. These revenues include fees related to payments volumes. Visa's obligation is to stand ready to provide continuous access to Visa's payments network and related services with respect to Visa-branded

---

[4] Visa Inc.'s 2023 Form 10-K at 8.

payments programs." It further states: "We offer a wide range of Visa-branded payment products that our clients, including 14,500 financial institutions, use to develop and offer payment solutions or services, including credit, debit, prepaid and cash access programs for individual, business and government account holders. During fiscal year 2023, Visa's total payments and cash volume was $15 trillion, and 4.3 billion payment credentials, which are issued Visa card accounts that were available worldwide to be used at more than 130 million merchant locations."[5]

19.     When a consumer purchases a Visa Vanilla card, the consumer pays a one-time "purchase" or "activation" fee of $5.95, in addition to loading a specific amount of money onto the card.

20.     Like other Visa cards, nonreloadable Visa Vanilla cards have a sixteen-digit number associated with the account printed on the front of the cards. Once purchased and loaded with funds, Visa Vanilla cards are not reloadable by the consumer or recipient. Funds are added to Visa Vanilla cards at the time of purchase between $5 and $500. When the funds are depleted, the consumer cannot add more money and the card becomes worthless. Cardholders may check a Visa Vanilla card's balance and review past transactions made with the card by entering the sixteen-digit number on the front of the card, the expiration date, and the three-digit CVV number on Vanillagift.com. Consumers can also obtain this information over the phone. Monthly or periodic statements are not sent to purchasers or cardholders. Visa Vanilla cards ordinarily do not require a PIN to be entered to complete a purchase. If a card terminal or merchant does require a PIN to complete a transaction, a Visa Vanilla cardholder may enter any four-digit number, which then becomes that card's PIN, unless and until it is changed.

---

[5] Id. at 4.

## II.   PLAINTIFF   PURCHASES   VISA   VANILLA   CARDS,   WHICH   ARE IMMEDIATELY DRAINED

21.   Plaintiff purchased four Visa Vanilla gift cards in December 2022, and four more in December 2023, from a CVS Pharmacy in New York, New York.  Plaintiff loaded $500 onto each gift card and then gifted them to his employees.  Plaintiff purchased the Visa Vanilla gift cards because they prominently feature the Visa name and logo, which caused Plaintiff to believe that the Visa Vanilla cards would be secure, that his funds would not be stolen, and that if any problems arose with the cards, Visa would assist Plaintiff in good faith.[6]  Had the Visa Vanilla cards not contained the Visa name and logo, Plaintiff would not have purchased the cards.

22.   One of the Visa Vanilla cards that Plaintiff purchased in 2023 is depicted as follows:[7]



_____

[6] Visa claims that it will protect consumers who use Visa products from fraudulent activity.  For example, Visa's website advertises a "Zero Liability Policy," which informs consumers that "[they] won't be held responsible for unauthorized charges made with your account or account information.  You're protected if your Visa credit or debit card is lost, stolen or fraudulently used, online  or  offline."   https://usa.visa.com/pay-with-visa/visa-chip-technology-consumers/zero-liability-policy.html (last visited Apr. 8, 2024).

[7] The account numbers, bar codes, and other identifying numbers have been redacted for security purposes in this public filing.



23.     The text on the back of the card reads, in part: "This card is issued by Pathward, N.A., Member FDIC, pursuant to a license from Visa U.S.A. Inc. Card is distributed and serviced by InComm Financial Services, Inc."  It also states: "For customer service, balance information, refunds, or to request a replacement Card, go to VanillaGift.com or call 1-833-322-6760."  The VanillaGift.com website prominent features Visa's logo.

24.     Shortly after he purchased four Visa Vanilla cards in December 2023, one of Plaintiff's employees informed him that she could not make purchases with the card because there were no funds on it.

25.     In response, on or about January 3, 2024, Plaintiff called Visa to report the issue and ask for assistance.  Visa informed Plaintiff that it had no ability to help him and promptly transferred Plaintiff's call to a bank that was previously unknown to Plaintiff.

26.     Plaintiff provided the card number to the person with whom he spoke and stated that his employee had not used the card but the card was nonetheless drained of funds.  The representative with whom Plaintiff spoke said that one or more purchases had been made using the card at a CVS Pharmacy.  The purchase(s) at the CVS Pharmacy were not made by Plaintiff's employee.

27.     Plaintiff was told that he would receive a form in the mail that he had to complete and submit before the bank could conduct an investigation.  Plaintiff never received the form.[8]

## III.    DESPITE THE KNOWN ISSUES WITH VISA VANILLA CARDS, DEFENDANTS HAVE TAKEN NO ACTION TO IMPROVE THEFT PREVENTION

28.     The manner in which Defendants package and sell Visa Vanilla cards enabled the theft of Plaintiff's funds.  Visa Vanilla cards are sold in thin cardboard sleeves that can easily be opened and reclosed in a manner that would not alert a reasonable consumer to the fact that the card's packaging had been compromised.  Thieves take advantage of the defective packaging to quickly open it, access the card, record the card's account numbers, and then reseal the package and return it to a store's rack without being detected by the retail store or the consumer.  The thieves then monitor the card's balance on Vanillagift.com.

29.     When the card is eventually purchased and loaded with funds, the thieves make purchases using the stolen account number until the card is drained of funds, a practice referred to as "card draining."  This is because the money on a nonreloadable Vanilla card is accessible to rightful owners or anyone else with the account information.  Visa Vanilla cards do not include a registration process that protects against fraudulent transactions.  Typically, this "card draining" occurs even before the card purchaser has an opportunity to use the card or give the card as a gift.

30.     A thief can also attach a barcode from a card they already have to an unsold gift card in a store.  When a consumer purchases the tampered card and loads cash onto it at the point of purchase, the consumer is, in fact, loading money onto a thief's Visa Vanilla card.

---

[8] On or about February 27, 2024—approximately one month after Plaintiff's original complaint was filed and nearly two months after he complained to Visa—Plaintiff received one replacement Visa Vanilla card in the mail.

31.     Defendants have failed to institute protocols that prevent anyone except the rightful cardholder(s) from making purchases with the card.  Defendants have also refused to reimburse cardholders for unauthorized transactions, despite the well-known security flaws of Visa Vanilla card packaging.  Further, had Defendants disclosed to Plaintiff and the Class members that they did not have adequate packaging, policies and security measures in place to secure customers' Visa Vanilla gift card information and Visa Vanilla gift card funds, Plaintiff and the Class members would not have purchased the Visa Vanilla gift cards.

32.     Upon information and belief, Defendants maintain exclusive knowledge of material facts regarding Visa Vanilla cards not known to Plaintiff and the Class – i.e., that the Visa Vanilla cards sold to consumers are defective, unsecure and easily subject to known fraud – yet Defendants actively concealed and/or suppressed those material facts from Plaintiff and the Class.  As such, Defendants had a duty to disclose to Plaintiff that the Visa Vanilla gift cards were defective in design, manufacture and/packaging.  Defendants failed to do so.

33.     Defendants have been aware of the rampant card-draining of its nonreloadable Visa Vanilla cards for years but have nonetheless failed to prevent the practice by improving the security features of the packaging.  Perhaps worse, the Defendants have also failed to refund cardholders for unauthorized transactions. Defendants failed to inform or disclose to the public, including Plaintiff and the Class members, that they were aware of an ongoing fraud with the Vanilla gift cards, making it possible that the funds on Defendants' Visa Vanilla cards could be easily accessed and stolen by third parties.  Defendants also failed to disclose that its practice was to not refund or replace the value of the stolen Visa Vanilla gift cards subjected to the known fraud.

34.     Plaintiff and the Class members had a reasonable expectation that Defendants would maintain the security of their Visa Vanilla gift card funds and gift card information.

35.     As a direct and proximate cause of Defendants' conduct, Plaintiff Schuman and members of the Class suffered an injury in the amount of money loaded onto the gift cards plus the service fee to purchase the cards of $5.95.

36.     Defendants have reaped enormous profits from their unlawful, unfair and deceptive business practices.

37.     Plaintiff Schuman had an experience similar to thousands of other New York consumers, who have had their funds stolen from their Visa Vanilla cards.  The theft occurs so rampantly because Defendants have failed to—and refuse to—improve the cards' security features.  Visa Vanilla cards are sold in cardboard sleeves the thieves can easily open and reseal after taking a given card's numbers.  Once the thieves have obtained the card information, they can drain the card of value before the rightful cardholder can use it.

38.     The existence of thousands of complaints from consumers regarding the unsecure and valueless Visa Vanilla cards are sufficient to put Defendants on notice that the funds on the gift cards were not secure upon purchase.  Despite having this knowledge, Defendants failed to take adequate and reasonable measures to ensure that third parties did not tamper with its gift cards.

39.     Defendants' conduct has been widely panned as dishonest and unfair.  Defendants are aware of complaints from consumers regarding their deficient practices.  Gift cards are used widely, which means Defendants' conduct impacts New York consumers indiscriminately.

40.     For example, one consumer wrote on the social media site, Quora, "I got scammed with Visa Vanilla gift cards I purchased for my kids for Christmas this year.  Thousands were

scammed this year after looking into it.  I have purchased gift cards every year for Christmas and I have never had this happen before."[9]

41.    Another victimized consumer wrote on Quora, "[I] [p]urchased this [Visa Vanilla] gift debit card at Walmart, within 48 hours the thieves drained $340.00 from [the] card.  I've sent them numerous emails and USPS letters by Priority with tracking.  They say they've never received my complaint."

42.    On a second website, sitejabber.com,[10] complaints about Defendants' lack of security protocols include:

a.    One consumer wrote on December 28, 2023, "Horrible! Purchased 150.00 [Visa Vanilla] for Xmas for grandson.  I tried to activate it when I tried there was NO Security code in back.  I called was told to use the swipe method.  Of course Did NOT work.  I'm trying to get replacement they giving runaround and now want MY ID why?!"

b.    Another consumer wrote on January 9, 2024, "Customer service is just about non existent.  I was given a 50.00 card. When I went to use it there was only 3.19 left. I've never used the card. I called customer service and after several calls finally got thru. I had to file a dispute and that department came back and said the transactions were valid. I asked for proof and they said they considered the case closed and wouldn't provide me proof of receipts."

43.    A Reddit post on December 18, 2023, entitled "Just lost $300 to vanilla Visa card Scam," has 30 comments further illustrating the nature and scope of Defendants' deceptive conduct.  One commenter wrote: "The scammers come in a and replace the cards we have in store

---

[9] https://www.quora.com/I-just-got-scammed-out-of-a-100-dollar-Visa-gift-card-What-should-I-do.

[10] https://www.sitejabber.com/reviews/vanillagift.com

with cards they have already taken the codes for. So as soon as you buy it they get the money added to their account leaving your card worthless."

44.    Despite causing consumers to believe that they won't be liable for unauthorized transactions, despite knowing that Visa Vanilla cards are frequently compromised by thieves prior to their being purchased, and notwithstanding the fact that Defendants failed to notify consumers of the risks associated with Visa Vanilla gift cards, Defendants still refuse to reimburse consumers for unauthorized transactions resulting, in part, from Defendants' own conduct.

45.    Defendants' practices, policies and procedures do not comply with the promises made to consumers, and they do not comply with federal law.

46.    IV.  THE ELECTRONIC FUND TRANSFER ACT, 15 U.S.C. § 1693, *et seq.*

47.    Pursuant to the Electronic Fund Transfer Act ("EFTA"), Defendants are required to repay Visa Vanilla gift card purchasers who are injured by unauthorized transactions.  The EFTA and its implementing Regulation E are landmark protections that shift liability for unauthorized transfers from consumers to banks.

48.    Under the EFTA, an unauthorized electronic fund transfer is an electronic fund transfer from a consumer's account "initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit[.]" § 1693a.

49.    The EFTA and Regulation E also require banks to disclose the terms and conditions that apply to EFTs in readily understandable language. 15 U.S.C. § 1693c(a); 12 C.F.R. § 1005.4.

50.    Consumer protections in the EFTA and Regulation E, including for unauthorized EFTs, cannot be waived or limited by any agreement, including consumers' deposit agreements, online account agreements, or fund transfer agreements with their banks. 15 U.S.C. § 1693l.

14

51.   The practical result of the EFTA and Regulation E is that banks bear the bulk of losses when consumers' funds are lost due to scammers' large-dollar, unauthorized EFTs.   Banks thus are incentivized to prevent unauthorized access to consumers' bank accounts through online or mobile channels, thereby fostering consumer confidence in the electronic banking system.

## CLASS ACTION ALLEGATIONS

52.45.   This action is brought by Plaintiff, for himself and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

53.   Plaintiff seeks to represent a class of all persons who purchased a Visa Vanilla card that had its funds drained prior to use by the consumer or its intended recipient under the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq.* (the "Nationwide Class").

54.46.   Plaintiff also seeks to represent a subclass class of all persons who, in the State of New York, purchased a Visa Vanilla card that had its funds drained prior to use by the consumer or its intended recipient under N.Y. Gen. Bus. Law §349 (the "New York SubclassClass").[11]

55.47.   Excluded from this Class are Defendants, their officers, directors and employees, and anyone who purchased Visa Vanilla cards for the purpose of resale.

56.48.   **Numerosity**.  The members of the class are so numerous and dispersed that it would be impracticable to join them individually.   At all relevant times, there were thousands of consumers who had Visa Vanilla gift cards that had been "drained."  While Plaintiff does not know the exact number of members of the Class at this time, Plaintiff believes there are, at minimum,

---

[11] All further references herein to the Class, unless otherwise noted, shall refer collectively to the Nationwide Class and the New York Subclass.

thousands of members of the Class. Defendants' records contain sufficient information to determine the exact number of persons in the Class.

57.49.  **Commonality**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to Class are:

          a.      Whether Defendants omitted material facts concerning the security of the packaging in which Visa Vanilla cards are sold;

          b.      Whether Defendants' wrongful conduct caused Plaintiff and the Class members' damages;

          c.      The amount of damages suffered by Plaintiff and Class members; and

          d.      Whether the Plaintiff and Class members are entitled to a reasonable award of attorneys' fees, interest and costs of suit and punitive treble damages.

58.50.  **Typicality**.  Plaintiff's claims are typical of the claims of the members of the Class he represents because they all purchased Visa Vanilla cards with the same defective and misleading packaging.

59.51.  **Adequacy of Representation**.  Plaintiff will adequately represent and protect the interests of the Class and has no interests that conflict with or are antagonistic to the interests of Class members.  Plaintiff has retained attorneys who are experienced and capable of prosecuting class actions and complex litigation.  Plaintiff's attorneys will actively conduct and be responsible for prosecuting this litigation, and have adequate resources, experience and commitment to litigate this matter.

60.52.  **Superiority**.  A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and unduly

burdensome for each of the individual Class members to bring a separate action. Moreover, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

61.53.  Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the common questions of law and fact enumerated above predominate over questions affecting only individual members of the Classes, and a class action is the superior method for fair and efficient adjudication of the controversy. The likelihood that individual members of the Class will prosecute separate actions is remote due to the limited damages per Class member and the time, expense, and risk associated with such litigation.

62.54.  Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds that apply generally to the Class, so that the final equitable relief that Plaintiff seeks here is appropriate with respect to the Class as a whole.

63.55.  Class certification is also appropriate because there is a readily identifiable class on whose behalf this action can be prosecuted. Class members are readily ascertainable from Defendants' records. A notice of pendency or resolution of this class action can be provided to Class members by direct mail, email, publication notice, or other similar means.

**FIRST CAUSE OF ACTION**

(New York Gen. Bus. Law § 349)
On Behalf of the New York SubclassClass

64.56.  Plaintiff Schuman brings this Count individually and on behalf of the members of the New York SubclassClass.

65.57.  Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

66.58.  By the acts and conducted alleged herein, Defendants committed unfair or deceptive acts and practices.  These acts and conduct include Defendants' misrepresentations that the Visa Vanilla cards are secure for consumer funds when, in fact, the packaging used with Visa Vanilla cards lacks necessary security features.  This is a deceptive act and unfair practice because Defendants know that the packaging does not adequately protect the card information, but fail to improve the packaging or establish procedures which would inhibit tampering with the packaging before sale.

67.59.  The foregoing deceptive acts and practices were directed at consumers.

68.60.  The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and benefits of Visa Vanilla cards to induce consumers to purchase Visa Vanilla cards.

69.61.  Plaintiff Schuman and members of the New York Subclass Class were injured because: (a) they would not have purchased Visa Vanilla cards had they known the cards were susceptible to "card draining," and (b) Visa Vanilla cards did not have the characteristics and benefits promised.  As a result, Plaintiff Schuman and the New York Subclass Class were damaged by the amount of money drained from their cards.

70.62.  As a result of Defendants' false, misleading, and deceptive statements and misrepresentations of fact, including but not limited to the misrepresentations described herein, Plaintiff Schuman and the members of the New York Subclass Class have suffered and continue to suffer economic injury.

71.63.  Plaintiff Schuman and members of the New York Subclass Class suffered an ascertainable loss caused by Defendants' misrepresentations equal to the drained funds.

18

72.64.   On behalf of himself and other members of the New York SubclassClass, Plaintiff Schuman also seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

### SECOND CAUSE OF ACTION

(The Electronic Fund Transfer Act)
On Behalf of the Nationwide Class

73.    Plaintiff realleges and incorporates herein by reference the allegations contained in all preceding paragraphs, and further alleges as follows:

74.    Defendants are financial institutions. 12 C.F.R. § 1005.2(i).

75.    Thieves used Plaintiff's Visa Vanilla cards to make unauthorized electronic fund transfers from Plaintiff's Visa Vanilla cards.

76.    After the unauthorized transfers were made, the unauthorized transfers appeared on the transaction history associated with Plaintiff's Visa Vanilla cards.

77.    Plaintiff notified Defendants of these errors within sixty (60) days of their appearances on Plaintiff's transaction history.

78.    Defendants knowingly and willfully failed to fulfill their obligations to investigate Plaintiff's unauthorized transactions and instead summarily concluded that the unauthorized transfers of funds were not in error when such conclusions could not reasonably have been drawn from the evidence available to the financial institutions at the time of the investigation. 15 U.S.C. § 1693f(e)(2).

79.    Defendants did not investigate and determine whether an error has occurred and report or mail the results of such investigation and determination to the consumer within ten (10) business days. 15 U.S.C. § 1693f(a).

80.   ~~Defendants did not provisionally recredit the consumers' account ten days after receipt of notice of error to investigate, for the amount alleged to be in error pending an investigation. § 1693f(c).  Instead, Defendants unlawfully determined there was no error.~~

81.   ~~Defendants refused to completely reverse or refund funds to Plaintiff consistent with their obligations under Regulation E, § 1005.6.~~

82.   ~~As a direct and proximate result of the conduct of Defendants, Plaintiff was unable to reclaim funds that were stolen Visa Vanilla cards within the authorized period for error resolution, and has been damaged thereby.~~

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following judgment:

A.    For an order certifying the Class, appointing Plaintiff as the representative of the Class, and designating the undersigned as Class Counsel;

B.    For an order declaring that the Defendants' conduct violates the N.Y. Gen. Bus. Law § 349 ~~and/or EFTA~~;

C.    Awarding compensatory, statutory, and/or ~~punitive~~ treble damages in favor of Plaintiff and members of the Class for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding Plaintiff and the Class restitution and/or disgorgement to the extent legal remedies are unavailable or insufficient;

E.    Awarding equitable relief against Defendants to prevent Defendants from continuing their ongoing unfair, unconscionable, and/or deceptive acts and practices;

F.    Awarding pre-judgment and post-judgment interest;

G.      Awarding Plaintiff and members of the Class their reasonable costs and expenses incurred in this action, including counsel fees, costs, and expert fees; and

H.      Awarding such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims so triable in this action

DATED: April 15June 26, 2024                                    Respectfully submitted,

**WOLF POPPER LLP**

By: /s/ *Patricia I. Avery*

Patricia I. Avery
Philip M. Black
Timothy D. Brennan
845 Third Ave.
New York, NY 10022
212-759-4600
pavery@wolfpopper.com
pblack@wolfpopper.com
tbrennan@wolfpopper.com

*Attorneys for Plaintiff and the Putative Classes*