UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                                  :
IRA SCHUMAN, *individually and on behalf of all*                  :
*others similarly situated*,                                      :
                                                                  :
                                           Plaintiff,             :
                                                                  :
                  -against-                                       :
                                                                  :
VISA U.S.A., INC., *et al.*,                                      :
                                                                  :
                                           Defendants.            :
                                                                  :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/23/25

1:24-cv-666-GHW

MEMORANDUM OPINION &
ORDER

GREGORY H. WOODS, United States District Judge:

Defendants Visa U.S.A., Inc., InComm Financial Services, Inc., and Pathward, N.A. market and sell Visa-branded gift cards at retailers across New York. Plaintiff Ira Schuman bought eight gift cards at a CVS, loaded each of them with $500, and gave them to his employees as holiday presents. Three of the cards, however, had been emptied of funds by scammers before Plaintiff's employees could use them. The scammers allegedly stole the cards' funds using a well-known technique called "card draining": they removed the cards from their packaging on the shelf, recorded the cards' account numbers, returned the cards to their packaging, and when Plaintiff later loaded money onto the cards, they used the account numbers to quickly make purchases before his employees could. Defendants' cards, Plaintiff says, are especially susceptible to "card draining" because their flimsy cardboard packaging allows scammers to access the cards inside without enough evidence of tampering to alert a reasonable consumer.

Plaintiff alleges that Defendants misled him into buying the cards. He alleges that the cards' prominent display of Visa's logo gave him the false impression that their funds would be secure from fraud, and that without this peace of mind, he would not have purchased the cards. He also

contends that the cards' express warnings regarding tampering and other potential security threats did not do enough to put him on notice of the potential that the cards would be subject to "card draining." He brings a claim for violation of Section 349 of the New York General Business Law, which declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

Defendants have each moved to dismiss Plaintiff's complaint for failure to state a claim. The Court concludes that, even accepting Plaintiff's well-pleaded allegations as true, no reasonable consumer would fail to recognize the possibility that a gift card they bought may be subject to a third-party scam. Nor would one reasonably expect that the Visa logo, standing alone, was a promise that no scam could ever occur. Accordingly, Defendants' motions to dismiss are GRANTED.

## I.    BACKGROUND[1]

### A.  Visa Vanilla Gift Cards

Visa® Vanilla gift cards ("Visa Vanilla cards") are "prepaid debit cards" sold in "retail stores throughout the United States." Dkt. No. 43 ¶ 2 (the "Second Amended Complaint" or "SAC"). They are "the size and shape of typical debit and credit cards," *id.* ¶ 3, and "can be used to pay for transactions both online and anywhere where Visa debit and credit cards are accepted," *id.* ¶ 2. When a consumer purchases a Visa Vanilla card, she pays the retailer the amount that she wishes to load onto the card plus a "$5.95 purchase charge." *Id.* ¶¶ 2, 7. The loaded amount "becomes immediately accessible to anyone in possession of the card's account numbers." *Id.* ¶ 2. "Once purchased and loaded with funds, Visa Vanilla cards are not reloadable by the consumer or

---

[1] The facts are taken from the Second Amended Complaint, Dkt. No. 43, and are accepted as true for the purposes of this motion. *See, e.g., Town of Babylon v. Fed. Hous. Fin. Agency,* 699 F.3d 221, 227 (2d Cir. 2012). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

recipient." *Id.* ¶ 20.  So, when a card's funds "are depleted, . . . the card becomes worthless." *Id.*

Defendant Pathward, N.A. ("Pathward") is a federally chartered savings bank that manufactures, markets, sells, and issues Visa Vanilla cards.  *Id.* ¶ 14; *see also id.* ¶ 23.  It is incorporated in Delaware and headquartered in South Dakota.  *Id.* ¶ 14.  "Pathward acts as the custodian of the Vanilla cardholder's funds." *Id.*  The cardholder's funds are "placed in an account at [Pathward] and drawn down as the card is used." *Id.*

Defendant InComm Financial Services, Inc. ("InComm") also manufactures, markets, and sells Vanilla Visa cards.  *Id.* ¶ 13.  It is incorporated in South Dakota and headquartered in Georgia. *Id.*  "InComm is a major administrator, distributor, and servicer of prepaid nonreloadable cards, including Visa Vanilla cards." *Id.*

Defendant Visa U.S.A. Inc. ("Visa," and, together with Pathward and InComm, "Defendants") licenses its name and trademark logo for use on the Visa Vanilla cards, *id.* ¶¶ 12, 18, 22–23, and "provides payment processing for Visa-branded card transactions," *id.* ¶ 12.  Visa is incorporated in Delaware and headquartered in California. *Id.*

Visa's logo is displayed on the bottom-right corner of the Visa Vanilla cards:



*Id.* ¶ 22.  The back of each card states, in part, that the card "is issued by Pathward, N.A., Member FDIC, pursuant to a license from Visa U.S.A. Inc.," that the card "is distributed and serviced by InComm Financial Services, Inc.," and that "[f]or customer service, balance information, refunds, or

to request a replacement card, go to VanillaGift.com or call 1-833-322-6760":



*Id.*

Visa Vanilla cards are sold in packaging made of "thin cardboard."  *Id.* ¶ 28.  Visa's logo is

also displayed on the packaging:



*Id.* ¶ 18; Dkt. No. 51 ("Wicker Declaration"), Ex. A.[2]  The back of the packaging provides, among

---

[2] The parties agree that the cards' packaging is properly considered on this motion to dismiss because it is integral to the Second Amended Complaint.  *See* Dkt. No. 49 at 4 n.1 ("Memorandum"); Dkt. No. 53 at 2 ("Visa Memorandum"); Dkt. No. 55 at 6 ("Opposition").  "A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint."  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal quotations and citations omitted).  A document is "integral to the complaint" where the complaint "relies heavily upon its terms and effect."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotations omitted).  The Second Amended Complaint relies heavily on the cards' packaging as part of its claim that Defendants provided misleading statements to purchasers of the cards.  It repeatedly alleges that the Visa logo displayed on the cards' packaging is misleading, *e.g.*, SAC ¶¶ 3, 18, 51, and that Defendants' statements on the cards and their packaging were misleading because of the packages' "defective" design, *id.* ¶¶ 6, 28, 31–33, 59.

other things, two warnings related to potential tampering by third parties. First, in the top right

corner, the packaging states, in capital letters:

> IF TAMPER EVIDENT, DO NOT PURCHASE. NO VALUE
> UNTIL ACTIVATED AT REGISTER.

Wicker Declaration, Ex. A. Second, above the account number associated with the card, the

packaging states, in red lettering:

> For security purposes, please check that the underlined portion of this
> number matches the number below.

*Id.* The statement refers to an underlined portion of the account number listed on the Visa Vanilla

card itself that is visible through a window in the packaging. *Id.*; *see also* Opposition at 15.

### B. Plaintiff Purchases Vanilla Visa Cards that Were Subject to a Third-Party Scam

Plaintiff Ira Schuman bought four Vanilla Visa cards at a CVS Pharmacy store in 2022 as

holiday gifts for his employees. SAC ¶ 11. He bought another four cards in December of 2023,

again as holiday gifts for his employees. *Id.* Each time that he purchased the cards, he paid the

$5.95 purchase fee, loaded the cards with $500, and distributed the cards to each of his employees.

*Id.* ¶¶ 7, 11.

Plaintiff alleges that he purchased the cards because their prominent display of the Visa logo

"caused [him] to believe that the Visa Vanilla cards would be secure, that his funds would not be

stolen, and that if any problems arose with the cards, Visa would assist Plaintiff in good faith." *Id.*

¶ 21. He alleges that if the cards had "not contained the Visa name and logo, [he] would not have

purchased the cards." *Id.*

"Of the four cards Plaintiff purchased in 2023, three were drained of funds through

unauthorized transactions." *Id.* ¶ 11. In a prior version of his complaint, Plaintiff alleged that all

four cards that he purchased in 2022 had been drained of funds. Dkt. No. 1 ¶ 11. Plaintiff's current

complaint does not allege that any of those cards were drained of funds.  SAC ¶ 11.

For one of the three affected cards, Plaintiff called to seek a refund and received one within two months.  After Plaintiff's employee informed him that "she could not make purchases with the card because there were no funds in it," Plaintiff "called Visa to report the issue and ask for assistance."  *Id.* ¶¶ 24–25.  "Visa informed Plaintiff that it had no ability to help him and promptly transferred Plaintiff to a bank."  *Id.*  The Second Amended Complaint leaves the bank unnamed.  *See id.*

Plaintiff provided the bank representative with the relevant card number and told the representative that his employee's card had been emptied of funds before she could use it.  *Id.* ¶ 26.  "The representative . . . said that one or more purchases had been made using the card at a CVS Pharmacy."  *Id.*  Plaintiff's employee had not made those purchases.  *Id.*

The bank representative told Plaintiff that "he would receive a form in the mail that he had to complete and submit before the bank could conduct an investigation."  *Id.* ¶ 27.  Plaintiff alleges that he "never received the form."  *Id.*  However, "[o]n or about February 27, 2024," approximately one month after Plaintiff brought this action and two months after he contacted Visa, Plaintiff was provided a replacement Visa Vanilla card in the mail.  *Id.* ¶ 27 n.8.

Plaintiff does not allege that he sought a replacement for the other two affected cards, or that he took any other steps to recover their lost funds.  *See id.* ¶¶ 24–27.

### C.  Defendants' Allegedly Deceptive Conduct

Plaintiff alleges that he was misled into buying the Visa Vanilla cards because Defendants misrepresented or failed to disclose the cards' susceptibility to third-party scams, including to "card draining," the scam that afflicted his employees' cards.  *See id.* ¶¶ 11, 59–62.  The cards are allegedly "sold in thin cardboard sleeves that can easily be opened and reclosed in a manner that would not alert a reasonable consumer" to the tampering.  *Id.* ¶ 28.  This permits scammers to open the

packaging, record the card's account information, and then close the packaging and return it to the shelf without detection. *Id.* When a consumer buys the card and loads money onto it, the scammers "make purchases using the stolen account number until the card is drained of funds, a practice referred to as 'card draining.'" *Id.* ¶ 29.

Plaintiff also alleges that Visa Vanilla cards are susceptible to a scam related to the cards' barcodes, though he does not allege that the cards he purchased were subject to that type of scam or that Defendants misled him into believing that the cards were immune to it. *See id.* ¶¶ 33–37, 59–62; *see also* Opposition at 2–3. The barcode scam involves a scammer "attach[ing] a barcode from a card they already have to an unsold gift card in a store." SAC ¶ 30. "When a consumer purchases the tampered card and loads cash onto it at the point of purchase, the consumer is, in fact, loading money onto a thief's Visa Vanilla card." *Id.*

Plaintiff alleges that Defendants knew the Visa Vanilla cards were susceptible to fraud because scams affecting those cards were "known and widespread." *Id.* ¶ 8. There is allegedly "widespread news coverage of card draining." *Id.*; *see id.* ¶ 8 n.2 (citing news articles). Consumers have also lodged "thousands of complaints" about scams affecting the cards in multiple public internet forums. *Id.* ¶¶ 38–43.

As discussed, Plaintiff alleges that he only bought Visa Vanilla cards because their display of the Visa logo misled him into believing that the cards "are secure for consumer funds," *id.* ¶ 59, or in other words, that the "cards would be secure, that his funds would not be stolen, and that if any problems arose with the cards, Visa would assist Plaintiff in good faith," *id.* ¶ 21. In his brief, Plaintiff also contends that the warnings on the cards' packaging did not suffice to alert him to the possibility of the kind of fraud that afflicted his cards because they do not "specifically reference" the "card draining scam that is described in [the] SAC." Opposition at 14.

### D.  Procedural History

Plaintiff brought this action on January 30, 2024.  Dkt. No. 1.  He filed a first amended complaint with the consent of Defendants, Dkt. No. 17; Dkt. No. 29; *see* Fed. R. Civ. P. 15(a)(2), and filed the operative Second Amended Complaint with leave of the Court, Dkt. No. 40; Dkt. No. 43; *see* Fed. R. Civ. P. 15(a)(2).  The Second Amended Complaint brings a single cause of action for violation of New York General Business Law § 349.  SAC ¶¶ 57–65.  It brings the claim on behalf of Plaintiff individually and on behalf of a putative class of similarly situated consumers within the State of New York.  *Id.* ¶¶ 46–56.  It seeks monetary damages and an injunction "to prevent Defendants from continuing their [allegedly] deceptive acts and practices."  *Id.* at 18.

InComm and Pathward filed a joint motion to dismiss the Second Amended Complaint on September 3, 2024.  Dkt. No. 48 (Motion); Dkt. No. 49 (Memorandum); Dkt. No. 50 ("Metcalf Declaration"); Dkt. No. 51 (Wicker Declaration).  Visa filed a separate motion to dismiss on the same day.  Dkt. No. 52 (Visa Motion); Dkt. No. 53 (Visa Memorandum); Dkt. No. 54 ("Tabak Declaration").

Plaintiff opposed both motions to dismiss on October 1, 2024.  Dkt. No. 55 (Opposition).  InComm and Pathward replied on October 22, 2024, Dkt. No. 57 ("Reply"); Dkt. No. 58 ("Lewis Declaration"), as did Visa, Dkt. No. 56 ("Visa Reply").

## II.    LEGAL STANDARD

### A.  Rule 12(b)(6)

Defendants have moved to dismiss the Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).  To determine plausibility, courts follow a "two-pronged approach."  *Iqbal*, 556 U.S. at 679.  "First,

although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### B. New York General Business Law § 349

Plaintiff's sole cause of action is for violation of Section 349 of the New York General Business Law ("Section 349" or "§ 349"). SAC ¶¶ 57–65. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a). To state a claim for violation of Section 349, a plaintiff must plausibly allege "that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940, 941 (2012)). "[B]ecause § 349 extends well beyond common-law fraud to cover a broad range of deceptive practices, and because a private action under § 349 does not require proof of the same essential elements . . . as common-law fraud, an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (internal citations omitted).

### III. DISCUSSION

Plaintiff has failed to state a claim pursuant to Section 349 because he has failed to plausibly

allege that Defendants' conduct was materially misleading.[3]  Plaintiff also lacks Article III standing to seek injunctive relief because he has failed to plausibly allege a likelihood of future—rather than past—injury.

### A.  Plaintiff Has Failed to Adequately Plead a Section 349 Claim

Plaintiff's Section 349 claim fails because the cards and their packaging would not mislead a reasonable consumer into believing that the cards were immune from fraud.  "To state a claim for false advertising or deceptive business practices under [Section 349], a plaintiff must plausibly allege that the deceptive conduct was 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"  *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018) (quoting *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013)).  This is an objective standard.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 26 (1995).  The question is not whether the plaintiff himself was misled, but whether the alleged conduct "would objectively [mislead] a reasonable consumer."  *Orlander*, 802 F.3d at 301; *accord Oswego Laborers*, 85 N.Y.2d at 26 (adopting "an objective definition of deceptive acts and practices . . . limited to those likely to mislead a reasonable consumer"); *Randolph v. Mondelez Glob. LLC*, No. 21-cv-10858 (JSR), 2022 WL 953301, at *3 (S.D.N.Y. Mar. 30, 2022) (noting that plaintiff's allegations regarding his "personal expectations" were "irrelevant" because they did not speak to whether a reasonable consumer acting reasonably under the circumstances would be misled) (collecting cases)).

"In determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial."  *Mantikas*, 910 F.3d at 636 (quoting *Fink*, 714 F.3d at 742).  The Court "therefore consider[s] the challenged advertisement as a whole, including disclaimers and

---

[3] Because Plaintiff has failed to plead that Defendants' conduct was misleading, the Court does not address whether he has adequately pleaded the remaining elements of his Section 349 claim—namely, whether Defendants' conduct was consumer-oriented and whether Plaintiff was injured as a result of Defendants' allegedly deceptive conduct.  *See Orlander*, 802 F.3d at 300.

qualifying language." *Id.* "[U]nder certain circumstances, the presence of a disclaimer or similar clarifying language may defeat a claim of deception." *Fink*, 714 F.3d at 742.

Whether a defendant's conduct was materially misleading "may be determined as a matter of law or fact as individual cases require." *Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc.*, 37 N.Y.3d 169, 178 (2021) (quoting *Oswego Laborers*, 85 N.Y.2d at 26) (parentheses omitted). The "inquiry is generally a question of fact not suited for resolution at the motion to dismiss stage." *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (collecting cases). Still, "[i]t is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." *Fink*, 714 F.3d at 741. Plaintiffs must do more than plausibly allege that a "label might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Bustamante v. KIND, LLC*, 100 F.4th 419, 426 (2d Cir. 2024) (quotation omitted). Instead, Plaintiffs must plausibly allege "a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.* (quotation omitted); *accord, e.g., Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226, 242 (S.D.N.Y. 2020).

Plaintiff's claims fail as a matter of law because it is not plausible, based on the allegations in the SAC, that a reasonable consumer would have been misled into thinking the Visa Vanilla cards were completely "secure for consumer funds." SAC ¶ 59. Plaintiff proffers two theories for why the cards would mislead a reasonable consumer into believing that the cards were safe from scams. *See id.* ¶ 21. First, Plaintiff alleges that the prominent "VISA" logo on the front of the cards and their packaging would mislead a reasonable consumer into believing that the cards' funds would not be stolen, *see id.* ¶¶ 21, 59; Opposition at 10, and that even if funds were stolen, Visa would assist any victims of theft "in good faith," SAC ¶ 21. Second, Plaintiff alleges that the cards fail to adequately disclose to consumers that they are "susceptible to 'card draining,'" *id.* ¶ 62, the specific scam that

affected Plaintiff's cards, *id.* ¶¶ 21–29.

It is not reasonable to infer from the allegations in the SAC that a "reasonable consumer acting reasonably under the circumstances" would be misled in either manner. *Oswego Laborers*, 85 N.Y.2d at 26. Plaintiffs' Section 349 claims therefore "lack the facial plausibility necessary to survive a motion to dismiss." *Fink*, 714 F.3d at 742 (dismissing claims under Section 349 as a matter of law).

### i. "VISA" Logo

The mere presence of a prominent "VISA" logo on the cards would not plausibly mislead a reasonable consumer into believing the cards were immune from fraud. That is Plaintiff's primary allegation: that Defendants' conduct was deceptive because their display of Visa's logo on the cards misled him into believing that the cards' "funds would not be stolen," *id.* ¶ 21; *see also, e.g., id.* ¶ 59, when in fact the cards were susceptible to their funds being stolen by third parties, including through "card draining," *e.g., id.* ¶¶ 33, 62. Plaintiff also alleges that the Visa logo misled him into believing that "if any problems arose with the cards, Visa would assist Plaintiff in good faith." *Id.* ¶ 21.

The Court accepts as true, as it must, that Mr. Schuman understood the Visa logo to be a guarantee against the possibility of any fraud associated with the card, rather than merely as a sign of which vendors would accept the card for payment. The question, however, is not whether Mr. Schuman inferred these security guarantees from Visa's logo, but whether a reasonable consumer would be likely to make the same inference. *See Oswego Laborers*, 85 N.Y.2d at 26; *Randolph*, 2022 WL 953301, at *3. There are no allegations in the Second Amended Complaint to suggest that one would. The Visa logo consists simply of the word "VISA"—it makes no assertions about the security from the possibility of fraud of the cards or of their packaging. SAC ¶ 22. "Courts in this District have dismissed claims where nothing in the label states or implies" the precise inference

drawn by a plaintiff bringing a claim under Section 349. *Brown v. Kellogg Sales Co.*, No. 1:20-cv-7283 (ALC), 2022 WL 992627, at *4 (S.D.N.Y. Mar. 31, 2022) (quotations and alterations omitted). In *Randolph v. Mondelez Global LLC*, 2022 WL 953301 (S.D.N.Y. Mar. 30, 2022), for example, the court dismissed a Section 349 claim alleging that a "Stoned Wheat Thins" label misleadingly implied that crackers were made with "stoneground whole wheat," *id.* at *1, because "'stoned wheat' does not mean 'stoneground wheat,'" and "neither 'stoneground wheat' nor 'stoned wheat' means 'whole wheat,'" *id.* at *4–*5. And in *Brown v. Kellogg Sales Co.*, 2022 WL 992627 (S.D.N.Y. Mar. 31, 2022), the court dismissed a Section 349 claim alleging that a "Frosted Strawberry" label misleadingly implied that a product only contained strawberry flavoring, *id.* at *1, because "nothing in the label state[d] or implie[d] that the product's flavor [was] derived entirely from [strawberries]," and there was "no 'only' or 'exclusively' modifier before the phrase 'Strawberry,'" *id.* at *4 (quotations and alterations omitted).[4]

The label at issue here asserts even less about the products than the labels at issue in *Randolph* and *Brown*. Again, the Visa logo on the Visa Vanilla cards begins and ends with the word "VISA." SAC ¶ 22. It makes no promises or implications against the possibility of scams, or that

---

[4] *See also, e.g.*, *Wallace v. Wise Foods, Inc.*, No. 20-cv-6831 (JPO), 2021 WL 3163599, at *2 (S.D.N.Y. July 26, 2021) (dismissing Section 349 claim alleging that "Cheddar & Sour Cream Flavored" label on chips packaging misleadingly implied that the chips' flavor was derived exclusively from cheddar or sour cream and that the chips were flavored only with natural ingredients, because the label did not make those assertions); *Pichardo v. Only What You Need, Inc.*, No. 20-cv-493 (VEC), 2020 WL 6323775, at *5 (S.D.N.Y. Oct. 27, 2020) (same, holding that "Smooth Vanilla" label did not state or imply that vanilla extract was the exclusive flavoring ingredient); *Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795, 802–03 (S.D.N.Y. 2021) (same, holding that "Natural Vanilla Flavor With Other Natural Flavors" label did not state or imply that "natural vanilla is the predominant source of the vanilla flavor").

Visa will respond to third-party fraud by assisting victims "in good faith." *Id.* ¶ 21.[5][6]  Unlike in the cases Plaintiff cites, where a label made specific, untrue assertions about an underlying product,[7] nothing about the word "Visa" would imply to a reasonable consumer the security from fraud that Plaintiff inferred.  *See id.* ¶¶ 21, 59; *see, e.g., Randolph*, 2022 WL 953301, at *3–5.

Nothing else in the SAC plausibly alleges that a reasonable consumer would infer an ironclad security promise from the Visa logo alone.  To the contrary, the SAC acknowledges that card scams—including for Visa-branded cards—are "known and widespread." *Id.* ¶ 8; *see also id.* ¶¶ 8 (alleging that there is "widespread coverage of card draining"), 37 (alleging that "thousands of other New York consumers" have been the subject of card draining and other prepaid card scams), 40–43 (alleging widespread commentary on public forums regarding scams to Visa Vanilla cards).  Visa is alleged to be a major brand in the prepaid card industry.[8]  *See id.* ¶ 18; *see also* Opposition at 11.  No

---

[5] The SAC also alleges that Visa's website advertises a "Zero Liability Policy," which states that consumers "won't be held responsible for unauthorized charges made with [their] account or account information," and that consumers are "protected if [their] Visa credit or debit card is lost, stolen or fraudulently used, online or offline." SAC ¶ 21 n.6.  The SAC does not allege that Plaintiff ever saw this statement on Visa's website, and at a pre-motion conference regarding the same allegation in Plaintiff's prior complaint, Plaintiff's counsel confirmed that Plaintiff "may not have seen that exact text" and instead offered the statement from Visa's website merely for "context." Metcalf Decl., Ex. 1 at 35:10–18.  Plaintiffs cannot sustain a claim under Section 349 based on misrepresentations they are not alleged to have seen.  An essential element of a claim under Section 349 is that the plaintiff "suffered injury *as a result* of the allegedly deceptive act or practice." *Orlander*, 803 F.2d at 300 (quotation omitted; emphasis added); *see, e.g., Lin v. Canada Goose US, Inc.*, 640 F. Supp. 3d 349, 360 (S.D.N.Y. 2022) (dismissing Section 349 claim because plaintiff did not allege that he "saw the misrepresentations prior to his purchase") (collecting cases).

[6] Though Plaintiff does not discuss them in his brief, the SAC adds several conclusory allegations that Defendants' "practice was not to refund or replace the value of the stolen Visa Vanilla gift cards subjected to the known fraud." SAC ¶¶ 8, 33, 44.  "[C]onclusory allegations" like these "will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (quotations and alterations omitted).  Plaintiff alleges no facts that would support an inference that Defendants had a practice of denying refunds.  He alleges a single instance where Defendants were contacted for a refund based on third-party fraud, *see* SAC ¶¶ 25–27, and in that single instance, Defendants gave Plaintiff a refund within two months, albeit after he had already initiated this action. *Id.* ¶ 27 n.8.

[7] This case is easily distinguishable from *Mantikas v. Kellogg Company*, which Plaintiff analyzes at length, Opposition at 10, because in *Mantikas*, the packages' labels made specific assertions about the product inside. 910 F.3d at 634.  The packages in that case had prominently labeled crackers either as "whole grain" or "made with whole grain." *Id.*  The court held that those labels were plausibly alleged to be "false message[s]" about the content of the crackers which were "not effectively cured by implicitly disclosing the predominance of enriched white flour in small print on an ingredients list on the side of the package[s]," *id.* at 638–39.  In this case, unlike in *Mantikas*, there is no "false message" that could mislead a reasonable consumer. *Id.*  The Visa logo, while prominent, makes no representation—false or otherwise—about the cards' fraud-security measures or the potential for third-party fraud.  *See* SAC ¶ 22.

[8] In his opposition brief, Plaintiff purports to quote various statements from Visa on its website about the importance to Visa of keeping its consumers' cards secure.  *See* Opposition at 11.  The Court has not considered these statements because they are not properly before the Court on this motion to dismiss.  The statements are not incorporated by

reasonable consumer would expect the allegedly "widespread" practice of third-party scams affecting

prepaid cards to somehow not affect one of the industry's major suppliers.  *See* SAC ¶¶ 18, 21, 59.

The Visa logo on the cards, based on the allegations in the SAC, would not deceive a reasonable

---

reference or integral to the SAC because while the SAC links to and quotes from one page of Visa's website, SAC ¶ 21 n.6, the SAC "does not link to, quote from, or otherwise rely on [the] pages of the website" from which the statements quoted in Plaintiff's opposition brief are taken, *Videri, Inc. v. ONAWHIM (OAW) Inc.*, No. 1:23-cv-2535 (GHW), 2024 WL 4027980, at *8 (S.D.N.Y. Sept. 3, 2024); *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (holding "Order Page" from Amazon's website was incorporated by reference because "the complaint alleged injuries . . . made possible only via clicking . . . on the Order Page," but reversing incorporation of "Registration Page" from Amazon's website because the complaint made no allegations regarding that page).

Nor can the Court judicially notice the statements at this stage.  Under the Federal Rules of Evidence, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "Because the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)."  *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (citing Fed. R. Evid. 201(b) advisory committee notes).  Defendants dispute whether the statements are properly considered at this stage, *see* Visa Reply at 2 & n.1, and Plaintiff provides nothing besides the links themselves in support of his contention that the website's authenticity is not in dispute, *see* Opposition at 11 & n.12.

Even if the statements were considered, they would not be actionable because they are puffery.  Puffery "is not actionable under Section 349."  *Yuille v. Uphold HQ Inc.*, 686 F. Supp. 3d 323, 344 (S.D.N.Y. 2023).  Puffery encompasses "exaggerated general statements that make no specific claims on which consumers rely because they are subjective claims about products, which cannot be proven either true or false."  *Id.* (internal quotations and citations omitted; collecting cases); *see In re Scotts EZ Seed Litig.*, 2013 WL 2303727, at *11 (S.D.N.Y. May 22, 2013).  "Puffery may occur in the form of 'a general claim of superiority over comparable products,' or, alternatively, as 'an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying.'"  *Weight Watchers Int'l, Inc. v. Noom, Inc.*, 403 F. Supp. 3d 361, 369–70 (S.D.N.Y. 2019) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)).  Visa's purported statements on its website—that its brand is "one of the most trusted brands in the world," that it "protects consumers," that "security is embedded in everything we do," and that it "aim[s] to increase transaction approvals so that business can thrive while customers are protected and satisfied,"—are exaggerated and unfalsifiable statements about Visa's fraud-security measures that "no reasonable consumer" would rely on "to understand either that Defendant had built specific security systems into its platform or that the [cards] would be immune to attacks by third-party hackers."  *Yuille*, 686 F. Supp. 3d at 345 (dismissing Section 349 claims based on statements by company that "[s]ecurity is in our DNA" and that "[s]ecurity is built into our systems and culture"); Opposition at 11.  Because they are puffery, they cannot support a claim under Section 349.  *See Yuille*, 686 F. Supp. 3d at 345; *Time Warner Cable*, 497 F.3d at 160.

Plaintiff purports to quote a final statement from Visa's website—that Visa has "the ability to identify and stop or mitigate illegal activity"—but provides no citation or link for this statement.  Opposition at 11.  In any event, this statement is not actionable because the SAC does not allege that it "was false when made."  *Yuille*, 686 F. Supp. 3d at 345.  Visa is not alleged to have no ability to identify, stop, or mitigate fraud; to the contrary, Plaintiff alleges that Visa could stop more fraud but is instead content to misrepresent the possibility that fraud may affect the Visa Vanilla cards. *See, e.g.*, SAC ¶¶ 31–33.

The Court notes, finally, that the fact that Visa would publish specific statements about its commitment to keeping its cards secure from fraud only confirms that the word "Visa" alone does not, in and of itself, include a promise about the cards' fraud security or the measures Visa takes to combat the possibility of fraud.  And yet, the content that the Second Amended Complaint alleges is misleading is just that—the word "Visa" alone.  SAC ¶ 22.

consumer into failing to recognize the possibility that they might lose funds in a card scam and be forced to ask the card issuers for a refund. *Id.* ¶¶ 23–27 & n.8; *see Troncoso v. TGI Friday's Inc.*, No. 19-cv-2735 (KPF), 2020 WL 3051020, at *7 (S.D.N.Y. June 8, 2020) (observing that reasonable consumers "do[] not lack common sense" (quotation omitted)).

### ii. Scam Warnings

The cards did not misleadingly omit any material information about the scams that allegedly affected Plaintiff's cards. According to Plaintiff, the cards and their packaging were misleading because they did not warn consumers that they are "defective, unsecure and easily subject to known fraud," SAC ¶ 32, and in particular, to "card-draining," *id.* ¶ 33. He argues that the multiple warnings on the cards' packaging did not suffice to put consumers on notice because they did not warn of the specific kind of card draining that afflicted Plaintiff's cards. *See* Opposition at 14–17; SAC ¶¶ 31–33. The first warning, as discussed, tells consumers not to purchase the card if there is "tamper[ing] evident." Wicker Declaration, Ex. 1 ("IF TAMPER EVIDENT, DO NOT PURCHASE."). Plaintiff does not dispute that this warning would encompass *some* instances of card draining, *see* Visa Memorandum at 8–9; Opposition at 14–15, but alleges that it fails to warn consumers of the possibility that a card-drainer may access a card's account information by tampering with the packaging in a way "that can go unnoticed by the reasonable consumer." SAC ¶ 6; *see also* Opposition at 14. The second warning alerts consumers to the possibility of a separate "security" threat, this one related to the card's barcodes. Wicker Declaration, Ex. 1. It instructs consumers to compare the portion of the card's barcode number that is visible through a window in the packaging with a number inside the packaging and confirm that they are the same. *Id.* ("For security purposes, please check that the underlined portion of this number matches the number below."); *see* Opposition at 15.

The Court of Appeals explained in *Oswego Laborers* that the standard for whether an omission

16

is materially misleading under Section 349 is the same as the standard for misrepresentations:

actionable omissions are "limited to those likely to mislead a reasonable consumer acting reasonably

under the circumstances." *Oswego Laborers*, 85 N.Y.2d at 26 (holding that this standard applies

whether the alleged deceptive acts are "representations or omissions"). The caselaw since *Oswego*

*Laborers*, however, has produced multiple standards for whether an omission would be likely to

mislead a reasonable consumer. As Defendants point out, the Second Circuit once inferred, in an

unpublished opinion, that "[w]here a claim alleges an omission, a Section 349(a) claim stands *only*

'where [the] business alone possesses material information that is relevant to the consumer and fails

to provide this information.'" *Lebowitz v. Dow Jones & Co.*, 508 F. App'x 83, 85 (2d Cir. 2013)

(summary order) (quoting *Oswego Laborers*, 85 N.Y.2d at 26) (emphasis added). The standard

articulated in *Lebowitz* quoted the following passage from *Oswego Laborers*, which distinguished

omission-based claims based on information in the exclusive possession of the defendant from

other types of omission-based claims:

> In the case of omissions in particular—the subject of the present case—[Section 349]
> surely does not require businesses to ascertain consumers' individual needs and
> guarantee that each consumer has all relevant information specific to its situation. The
> scenario is quite different, however, where the business alone possesses material
> information that is relevant to the consumer and fails to provide this information.

*Oswego Laborers*, 85 N.Y.2d at 26. Multiple courts in this circuit have understandably applied the

same pleading standard for omission-based claims as in *Lebowitz*, though of course unpublished

Second Circuit decisions "do not have precedential effect." 2d Cir. Loc. R. 32.1.1; *see, e.g., Lee v.*

*Mikimoto (Am.) Co.*, No. 22-cv-01923 (PAC), 2023 WL 2711825, at *7 (S.D.N.Y. Mar. 30, 2023);

*Morales v. Apple, Inc.*, No. 22-cv-10872 (JSR), 2023 WL 5579929, at *3 (S.D.N.Y. Aug. 29, 2023);

*Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 151 (S.D.N.Y. 2022); *Gordon v. Target Corp.*, No. 20-cv-

9589 (KMK), 2022 WL 836773, at *10 (S.D.N.Y. Mar. 18, 2022); *Yodice v. Touro Coll. & Univ. Sys.*,

No. 21-cv-2026 (DLC), 2021 WL 5140058, at *5 (S.D.N.Y. Nov. 4, 2021), *aff'd in part, vacated in part,*

*remanded*, No. 21-2986-cv, 2024 WL 3466546 (2d Cir. July 19, 2024).

New York state courts do not appear to have adopted the narrow rule articulated in *Lebowitz*. In *Gomez-Jimenez v. New York Law School*, the Appellate Division, First Department noted merely that omission-based claims brought under Section 349 are "*appropriate* where the business alone possesses material information . . . and fails to provide this information," without stating that this is the only instance in which such claims would stand. 956 N.Y.S.2d 54, 58 (1st Dep't 2012) (citing *Oswego Laborers*, 85 N.Y.2d at 26) (emphasis added). And in *Krobath v. South Nassau Communities Hospital*, the Second Department stated simply that "it is possible to engage in deceptive trade practices through omissions as well as affirmative representations," and that this is "particularly" true where the defendant "alone possess [the omitted] information." 115 N.Y.S.3d 389, 392 (2d Dep't 2019) (quoting *Oswego Laborers*, 85 N.Y.2d at 26).

Moreover, other courts in this circuit—including the Second Circuit in an unpublished opinion that postdates *Lebowitz*—have read *Oswego Laborers* as requiring that a plaintiff must plausibly plead *either* that "'the business alone possesses material information that is relevant to the consumer and fail[ed] to provide this information' *or* that plaintiffs could not 'reasonably have obtained the relevant information they now claim the defendant failed to provide.'" *Paradowski v. Champion Petfoods USA, Inc.*, No. 22-962-cv, 2023 WL 3829559, at *2 (2d Cir. June 6, 2023) (summary order) (quoting *Oswego Laborers*, 85 N.Y.2d at 26–27) (emphasis added); *Karabas v. TC Heartland LLC*, No. 24-cv-2722 (AMD) (VMS), --- F. Supp. 3d ---, 2025 WL 777001, at *7 (E.D.N.Y. Mar. 11, 2025); *Boghossian v. Capella Univ., LLC*, No. 24-cv-3007 (VEC), 2025 WL 934878, at *4 (S.D.N.Y. Mar. 27, 2025); *Dimond v. Darden Restaurants, Inc.*, No. 13-cv-5244 (KPF), 2014 WL 3377105, at *13 (S.D.N.Y. July 9, 2014); *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 529 (S.D.N.Y. 2003); *see also Bates v. Abbott Lab'ys*, No. 24-919-cv, 2025 WL 65668, at *3 n.3 (2d Cir. Jan. 10, 2025) (summary order) (affirming dismissal of omission-based Section 349 claim "because a reasonable consumer could

certainly discover and examine the [allegedly omitted adverse] health effects of added sugar on their own, including from the numerous publicly available studies and sources that [the plaintiff] cites in her complaint"). These courts phrase the standard for pleading an omission-based claim as a choice between two options, but in the Court's view, they are really articulating one pleading standard and one example of how to meet it. The pleading standard is that an omission-based claim must plausibly allege that the "plaintiff[] could not 'reasonably have obtained the [omitted] information.'" *E.g.*, *Paradowski*, 2023 WL 3829559, at *2 (quoting *Oswego Laborers*, 85 N.Y.2d at 26). One example—though not the only example—of how to meet that standard is if the defendant "alone possesses [the omitted] information." *Oswego Laborers*, 85 N.Y.2d at 26.

    With that understanding, the Court agrees that the best reading of *Oswego Laborers* is that "an omission-based claim for § 349 liability" must plausibly allege that the plaintiff "could not 'reasonably have obtained the relevant information they now claim the defendant failed to provide.'" *Paradowski*, 2023 WL 3829559, at *2 (quoting *Oswego Laborers*, 85 N.Y.2d at 26) (alterations omitted). In *Oswego Laborers*, the plaintiffs were non-profit associations that opened savings accounts with the defendant bank. 85 N.Y.2d at 23. At the time, non-profit associations were exempt from a federal regulation capping the principal on which a bank would pay interest to a commercial entity with a savings account. *Id.* The bank opened capped-interest accounts for the plaintiffs without disclosing that the interest on the accounts was capped or that the plaintiffs qualified for accounts with interest that was not capped, *id.* at 23–24, and only informed the plaintiffs that their interest was capped seven years after the accounts were opened, *id.* at 24. The court found the record "inconclusive as to whether a reasonable consumer in [the] plaintiffs' circumstances might have been misled by the [defendant's] conduct" because the parties disputed whether the defendants had provided any documentation informing the plaintiffs that they were being given accounts with interest caps or that they qualified for accounts without interest caps. *Id.* at 27. It explained that the bank's "liability

will depend, in part, on whether [the] plaintiffs possessed or could reasonably have obtained the relevant information they now claim the [defendant] failed to provide." *Id.*

The Court does not read *Oswego Laborers* as limiting omission-based claims to only those where the omitted information is in the defendant's exclusive possession. *Lebowitz*, 508 F. App'x at 85. The *Oswego Laborers* court did note that Section 349 "surely does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information," but it did not go so far as to say *no* information outside of a business's exclusive possession could ever give rise to an omission-based claim. 85 N.Y.2d at 26. The court merely identified the failure to provide information in one's exclusive possession as one "scenario" that may give rise to an omission-based claim. *See id.* at 26–27. That is how New York's intermediate courts appear to have interpreted *Oswego Laborers*—as explaining that "[o]mission-based claims are *appropriate* 'where the business alone possesses material information . . . and fails to provide [it],'" but not that they are limited to such scenarios. *Gomez-Jimenez*, 956 N.Y.S.2d at 58 (quotation omitted); *accord Krobath*, 115 N.Y.S.3d at 392.

Instead, the holding in *Oswego Laborers* was that the defendant bank's "liability" under Section 349 would "depend, in part, on whether [the] plaintiffs *possessed or could reasonably have obtained* the relevant information they now claim the [defendant] failed to provide." 85 N.Y.2d at 27 (emphasis added). The court did say "in part," *id.*, but that appears to reflect the fact that "deceptive or misleading conduct" is just one of three required elements of a claim brought under Section 349, *see id.* at 25 (observing that a Section 349 claim requires that the "defendant's acts are directed to consumers," that they are "deceptive or misleading in a material way," and that "plaintiff has been injured by reason thereof"), rather than a determination that an omission-based claim can survive without a plausible allegation that the plaintiff could not "reasonably have obtained the [omitted] information," *id.* at 27. The court analyzed the "misleading conduct" element of the plaintiffs'

Section 349 claim exclusively by analyzing whether the plaintiffs possessed or could reasonably have accessed the omitted material. *Id.* at 27. Moreover, requiring an omission-based claim to plead that the plaintiff could not have reasonably obtained the omitted information is consistent with the *Oswego Laborers* court's requirement that the omission be "likely to mislead a reasonable consumer acting reasonably under the circumstances," *id.* at 26, as well as its observation that Section 349 "does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation," *id.*; *see also id.* (cautioning against a reading of Section 349 that would invite "a tidal wave of litigation against businesses that was not intended by the Legislature"); *Dimond*, 2014 WL 3377105, at *13 (explaining that "[i]n cases alleging a deceptive act [under Section 349] based on an omission," the plaintiff must allege "why the omission was deceptive by alleging that the information omitted was solely within the defendant's possession or that a consumer could not reasonably obtain such information" (quotation omitted)); *Pelman*, 237 F. Supp. 2d at 529 (similar).

For these reasons, in the Court's view, the more relaxed reading of the pleading standard for omission-based claims under Section 349—the one suggested by the Second Circuit's summary orders in *Paradowksi* and *Bates*—is the better reading of *Oswego Laborers*. *See Paradowski*, 2023 WL 3829559, at *2; *Bates*, 2025 WL 65668, at *3 n.3. To plead an omission-based claim under Section 349, a plaintiff must plausibly plead that they could not "reasonably have obtained the relevant information they . . . claim the [defendant] failed to provide." *Oswego Laborers*, 85 N.Y.2d at 27.

Plaintiff's Section 349 claim fails even under this more relaxed standard. The SAC does not plausibly allege that Plaintiff could not "reasonably have obtained the relevant information" about the cards' potential susceptibility to fraud. *Id.* Plaintiff could have reasonably obtained this information because, as alleged, the risk of card fraud was "known and widespread." *Id.* ¶ 8. Again, the SAC cites "numerous publicly available . . . sources" regarding the prevalence of prepaid card

fraud, *Bates*, 2025 WL 65668, at *3 n.3; *see Pelman*, 237 F. Supp. 2d at 529 & n.16 (dismissing claim

that McDonald's misleadingly omitted nutritional content from their food offerings because that

"information [was] available to the public" and could be reasonably obtained), including

"widespread news coverage of card draining," SAC ¶ 8; *id.* ¶ 8 n.2 (citing three news sources), and

"thousands of complaints from consumers" on multiple public internet forums about third-party

scams afflicting the Visa Vanilla cards, *id.* ¶¶ 39–43.  Prepaid card scams are so "known and

widespread" that since 2023, sellers of prepaid cards have been required under New York law to

provide notices at or near the cards "caution[ing] the purchaser about prepaid card scams" and

"instruct[ing] the purchaser on what to do if they suspect they might be a potential victim of such a

scam."  N.Y. Gen. Bus. Law § 396-i at 2-b(a); SAC ¶ 8.  The SAC alleges nothing to suggest that

Plaintiff could not "reasonably have obtained" this well-known and widely publicized information.

*Oswego*, 85 N.Y.2d at 27.  That is, the SAC alleges nothing to suggest that Plaintiff could not

reasonably have obtained the information necessary to understand that the cards might be subject to

a third-party scam given "the well-known security flaws" allegedly inherent in the cards' packaging,

SAC ¶ 31, and the "known and widespread" nature of card fraud, *see id.* ¶ 8.  *See Troncoso*, 2020 WL

3051020, at *7 ("A reasonable consumer does not lack common sense." (quotation omitted)).

    Moreover, Plaintiff, or at least any reasonable consumer, would be reminded of the well-

known potential for third-party fraud by the warnings on the cards themselves—at a minimum from

the warning to cross-reference the barcode numbers "[f]or security purposes," Wicker Declaration,

Ex. 2, if not also from the warning not to buy the card if any tampering on the package is evident,

Wicker Declaration, Ex. 1.  Plaintiff argues that the warnings did not provide sufficient notice

specifically of card-draining, as opposed to the general potential for fraud, Opposition at 14–15

(arguing that the warnings did not "specifically reference the potential harms that are associated"

with the cards and that "[n]either warning refers to the card draining scam that is described in [the]

SAC"), but as the Court of Appeals explained in *Oswego Laborers*, Section 349 "does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation," 85 N.Y.2d at 26.  The statute does not require card sellers to list every specific kind of fraud that may diminish a card's funds and compel a buyer to ask the business for a refund.  *See id.*; *Beth Israel Med. Ctr. v. Verizon Bus. Network Servs., Inc.*, No. 11-cv-4509 (RJS), 2013 WL 1385210, at *7–*8 (S.D.N.Y. Mar. 18, 2013) (dismissing Section 349 claim where alleged omissions did not "conceal[] the harm alleged"); SAC ¶¶ 25–27 & n.8 (alleging that Plaintiff requested and received a replacement card when a card he purchased had its funds drained).  Because Plaintiff could reasonably have obtained the knowledge of the actual "harm alleged"—that is, that the cards might be subject to a third-party scam that depletes them of their funds—his omission-based claim fails.  *Beth Israel*, 2013 WL 1385210, at *8 (Sullivan, J.) (granting motion to dismiss claim under Section 349).

Because Plaintiff has failed to plausibly allege that he could not "reasonably have obtained the relevant information" necessary to understand that the cards may be the target of third-party fraud, Plaintiff has failed to plead that Defendants' alleged omissions were misleading in violation of Section 349.  *Oswego*, 85 N.Y.2d at 26–27.

### B.  Plaintiff Lacks Standing to Pursue Injunctive Relief

Plaintiff does not have standing to pursue injunctive relief because he is aware of the allegedly deceptive statements and omissions on the cards and therefore cannot demonstrate that he will be harmed in a similar way in the future.  "A plaintiff seeking to represent a class must personally have standing."  *Nicosia*, 834 F.3d at 239.  "Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury."  *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111–12 (1983)).  "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the

plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Id.* "In a deceptive business practices action under [Section 349], the Second Circuit has determined that absent an intent to purchase the offending product in the future, a plaintiff lacks standing to seek injunctive relief." *Campbell v. Whole Foods Mkt. Grp., Inc.*, 516 F. Supp. 3d 370, 394–95 (S.D.N.Y. 2021) (quotations omitted).

The Second Amended Complaint does not allege that Plaintiff intends to purchase Visa Vanilla cards in the future. *See* SAC at 18. Even if it did, the Second Amended Complaint would fail to plausibly allege a likelihood of future harm. The Second Circuit explained in *Berni v. Barilla S.P.A.* 964 F.3d 141 (2d Cir. 2020) that even supposing that a past purchaser has "been deceived by the product's packaging once, they will not again be under the illusion" that caused their initial harm if they buy the product again in the future. *Id.* at 148. "Instead, the next time they buy one of the [products], they will be doing so with exactly the level of information that they claim they were owed from the beginning." *Id.* "In such circumstances, plaintiffs lack standing to seek injunctive relief because '[t]he requisite imminent threat of future injury [is not] present,' even 'based on a representation by plaintiff of intent to purchase' the same deceptively marketed product." *Quintanilla v. WW Int'l, Inc.*, 541 F. Supp. 3d 331, 341 (S.D.N.Y. 2021) (quoting *Berni*, 964 F.3d at 148).[9]

The SAC fails to allege standing for the same reason that the plaintiffs lacked standing in *Berni.* Plaintiff alleges that had he "known the cards were susceptible to 'card draining,'" he would not have purchased the cards. SAC ¶ 62. He now knows that they are susceptible to card draining.

---

[9] "*Berni* itself addressed only whether an entire certified class of past purchasers could show the requisite likely future harm to support common treatment under Federal Rule of Civil Procedure 23, not whether any given purchaser could ever show such likelihood." *Quintanilla*, 541 F. Supp. 3d a 341 n.3; *see Berni*, 964 F.3d at 149. "But since *Berni* issued, courts in this Circuit, including this one, 'have uniformly applied *Berni* in the context of motions to dismiss' directed at the named plaintiff's individual claims." *Quintanilla*, 541 F. Supp. 3d a 341 n.3 (quoting *Campbell*, 516 F. Supp. 3d at 395 n.17) (collecting cases).

*See id.*; *see also, e.g., id.* ¶ 8. If Plaintiff "does purchase the [card] again in the future, [he] will not be harmed in a similar way, because any future purchase will be made with knowledge" of the cards' susceptibility to fraud. *Campbell*, 516 F. Supp. 3d at 395. Therefore, Plaintiff lacks standing. *See id.*; *Quintanilla*, 541 F. Supp. 3d at 342.[10]

## IV.    LEAVE TO AMEND

Plaintiff has requested leave to amend the Second Amended Complaint if his claims are dismissed. Opposition at 24 & n.26. That request is granted. Leave to amend should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead," *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Moreover, where, as here, a plaintiff has not yet had the benefit of a ruling on the sufficiency of his allegations, he may "not see the necessity of amendment or be in a position the weigh the practicality and possible means of curing specific deficiencies." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). Because Plaintiff has not yet had the opportunity to amend his complaint with the benefit of a ruling from the Court, the Second Amended Complaint is dismissed without prejudice. Within twenty-one days, Plaintiff may file a third amended complaint to cure the deficiencies identified in this opinion.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Second Amended Complaint are GRANTED. The Clerk of Court is directed to terminate the motions pending at Dkt. No. 48

---

[10] Plaintiff attempts to distinguish *Berni* from this case by arguing that in this case, a consumer has no way of knowing if the card they purchase is "fraud-prone" until they have already purchased the card and suffered an injury. Opposition at 23–24. But that was also true of the plaintiffs in *Berni*. In *Berni*, the defendant had allegedly misrepresented the volume of pasta sold in its packages. 964 F.3d at 144. The volume of pasta in the box could not be determined from the packaging alone; it would only be revealed after the box was purchased and opened. *See id.*

and Dkt. No. 52.

      SO ORDERED.

Dated:  June 23, 2025
New York, New York

                                                         GREGORY H. WOODS
                                     United States District Judge